01

02

03

04

05

06                        UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
07                                   AT SEATTLE

08 NATIVIDAD A. RODRIGUEZ,                    )
                                              )   CASE NO. C12-0694-TSZ-MAT
09            Plaintiff,                       )
                                              )
10      v.                                     )   REPORT AND RECOMMENDATION
                                              )
11 MICHAEL J. ASTRUE, Commissioner of          )
   Social Security,                            )
12                                            )
              Defendant.                        )
13 _____    )

14         Plaintiff Natividad A. Rodriguez appeals the final decision of the Commissioner of the

15 Social Security Administration ("Commissioner") which denied her application for Disability

16 Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33,

17 after a hearing before an administrative law judge ("ALJ").   For the reasons set forth below,

18 the Court recommends that the Commissioner's decision be REVERSED and REMANDED

19 for further proceedings.

20                     I.   FACTS AND PROCEDURAL HISTORY

21         Plaintiff   was   born   in   1960   and   was   46   years   old   on   the   date   last   insured.

22 (Administrative Record ("AR") 177.)   She has a high school education and previously worked

REPORT AND RECOMMENDATION
PAGE -1

01  as a janitor, fast food worker, and teacher's assistant/child care attendant.  (AR 18, 85, 209,

02  215.)  On April 21, 2008, she filed an application for DIB, alleging disability beginning

03  December 14, 2001.  (AR 18, 177-78.)

04      The Commissioner denied plaintiff's application initially and on reconsideration.

05  (AR 121-22.)  She requested a hearing which took place on April 2, 2010.  (AR 30-97.)  On

06  July 12, 2010, the ALJ issued a decision finding plaintiff not disabled.  (AR 18-25.)  The

07  Appeals Council denied plaintiff's request for review (AR 1-5), making the ALJ's ruling the

08  "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g).  On April

09  20, 2012, plaintiff timely filed the present action challenging the Commissioner's decision.

10  (Dkt. 1.)

11                                    II.  JURISDICTION

12      Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§

13  405(g) and 1383(c)(3).

14                                    III. DISCUSSION

15      The Commissioner follows a five-step sequential evaluation process for determining

16  whether a claimant is disabled.  *See* 20 C.F.R. § 416.920.  At step one, it must be determined

17  whether the claimant has engaged in substantial gainful activity.  The ALJ found plaintiff had

18  not engaged in substantial gainful activity during the period from her alleged onset date of

19  December 14, 2001, through her date last insured of December 31, 2006.  (AR 20.)  At step

20  two, it must be determined whether the claimant suffers from a severe impairment.  The ALJ

21  found plaintiff's degenerative joint disease in both knees and bilateral epicondylitis severe.

22  *Id*.  Step three asks whether the claimant's impairments meet or equal the criteria of a listed

REPORT AND RECOMMENDATION
PAGE -2

01 impairment.  The ALJ found plaintiff's impairments did not meet or equal the criteria of a

02 listed impairment.  *Id*.  If the claimant's impairments do not meet or equal a listing, the

03 Commissioner must assess residual functional capacity ("RFC") and determine at step four

04 whether the claimant has demonstrated an inability to perform past relevant work.  The ALJ

05 found plaintiff able to perform

06 less than a full range of light work as defined in 20 CFR 404.1567(b).  She could
lift/carry 10 pounds frequently and 20 pounds occasionally.  She could stand/walk
07 for no more than 1 hour at a time for a total of 6 hours in an 8 hour day.  She had no
sitting restrictions.  She could occasionally bend, stoop, and crouch.  She could
08 not kneel, crawl, or balance.  She could not work at unprotected heights and could
not climb ladders, ropes, or scaffolds.  She could occasionally climb stairs and
09 ramps.  She could occasionally operate foot pedals.  She could frequently work
overhead and reach in all directions with both upper extremities.  She could
10 perform frequent handling.

11 (AR 21.)  With that assessment, the ALJ found plaintiff able to perform her past relevant work

12 as a teacher's assistant/child care attendant as generally performed.  (AR 24.)

13       If the claimant is able to perform her past relevant work, she is not disabled; if the

14 opposite is true, then the burden shifts to the Commissioner at step five to show that the

15 claimant can perform other work that exists in significant numbers in the national economy,

16 taking into consideration the claimant's RFC, age, education, and work experience.  In the

17 alternative, the ALJ reached step five.  Based on the testimony of a vocational expert, the ALJ

18 found plaintiff able to perform a substantial number of unskilled jobs in the national economy

19 and, therefore, to be not disabled.  (AR 24-25.)

20       Plaintiff argues that the ALJ erred in finding her able to perform her past relevant work

21 as a teacher's assistant/child care attendant as generally performed; in finding her able to

22 perform other work as a semiconductor die loader, call out operator, and folder; in erroneously

01   rejecting the opinion of treating physician Ralph Haller, M.D.; and in failing to evaluate her

02   obesity.   (Dkt. No. 18 at 1-2.)   Plaintiff also argues that the ALJ *de facto* reopened the initial

03   denial of her prior application for benefits.   *Id*. at 2.   She requests remand for further

04   administrative proceedings.   *Id*. at 19.   The Commissioner argues the ALJ's decision is

05   supported by substantial evidence and should be affirmed.   (Dkt. No. 22.)

06                                                    <u>Step Four</u>

07            At step four, the claimant has the burden of showing that she is no longer able to

08   perform her past relevant work.   *Lewis v. Barnhart,* 281 F.3d 1081, 1083 (9th Cir. 2002)

09   (citing *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001)).   The step four determination

10   involves a comparison between the demands of the claimant's former work and her present

11   capacity.   *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986).   A claimant cannot merely

12   show that she is incapable of performing the particular job she once performed; she must prove

13   that she cannot return to the same type of work.   *Id*. at 798.   If the claimant is unable meet her

14   burden, that burden remains with her rather than shifting to Secretary to proceed with step five.

15   *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).

16            A person is not disabled if they are able to perform their past work.   20 C.F.R. §

17   404.1502(f).   Social Security Ruling ("SSR") 82–61 describes the tests for determining

18   whether or not a claimant retains the capacity to perform her past relevant work.   One of the

19   tests identifies that "where the evidence shows that a claimant retains the RFC to perform the

20   functional demands and job duties of a particular past relevant job as he or she actually

21   performed it, the claimant should be found to be 'not disabled.'"   SSR 82–61.   Another test is

22   "[w]hether the claimant retains the capacity to perform the functional demands and job duties

REPORT AND RECOMMENDATION
PAGE -4

01 of the job as ordinarily required by employers throughout the national economy." *Id.*

02      The *Dictionary of Occupational Titles* ("DOT") is the "best source for how a job is

03 generally performed." *Pinto*, 249 F.3d at 845.  In classifying prior work, the agency must

04 keep in mind that every occupation involves various tasks that may require differing levels of

05 physical exertion.  It is error for the ALJ to classify an occupation "according to the least

06 demanding function." *Valenica v. Heckler*, 751 F.2d 1082, 1086 (9th Cir. 1985).  DOT

07 descriptions "can be relied upon — for jobs that are listed in the DOT — to define the job as it

08 is *usually* performed in the national economy."  SSR 82–61.  Thus, "if the claimant cannot

09 perform the excessive functional demands and/or job duties actually required in the former job

10 but can perform the functional demands and job duties as generally required by employers

11 throughout the economy, the claimant should be found to be 'not disabled.'" *Id.*

12      A claimant's properly completed vocational report (SSA-3369-F6) may be sufficient to

13 furnish information about their past work.  *Id*.  However, when significant variation exists

14 between a claimant's description of her job and the DOT description of his job, it may be the

15 result of a composite job.  *Id.*  A composite job has "significant elements of two or more

16 occupations, and as such, ha[s] no counterpart in the DOT." *Id.*  Composite jobs are

17 evaluated "according to the particular facts of each individual case." *Id.*

18      Pursuant to SSR 00-4p, an ALJ has an affirmative responsibility to ask whether a

19 vocational expert's testimony conflicts with the DOT, and, if there is a conflict, whether there

20 is a reasonable explanation for such conflict.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th

21 Cir. 2007) ("[W]e address the question whether, in light of the requirements of SSR 00-4p, an

22 ALJ may rely on a vocational expert's testimony regarding the requirements of a particular job

01  without first inquiring whether the testimony conflicts with the Dictionary of Occupational

02  Titles.   We hold than an ALJ may not.").   As stated by the Ninth Circuit, "'[A]n ALJ may

03  rely on expert testimony which contradicts the DOT, but only insofar as the record contains

04  persuasive evidence to support the deviation.'"   *Id*. at 1153 (quoting *Johnson v. Shalala*, 60

05  F.3d 1428, 1435 (9th Cir. 1995)); *see also Pinto*, 249 F.3d at 847 ("We merely hold that in

06  order for an ALJ to rely on a description in the [DOT] that fails to comport with a claimant's

07  noted limitations, the ALJ must definitively explain this deviation.").

08       In this case, the ALJ found plaintiff capable of performing her past relevant work as a

09  teacher's assistant/child care attendant as generally performed.   (AR 24.)   In support of this

10  finding, the ALJ relied on vocational expert testimony regarding the demands of plaintiff's

11  past relevant work as it is generally performed in the national economy.   *Id*.

12       Plaintiff argues that substantial evidence does not support the ALJ's finding that she

13  could perform her past relevant work as a teacher's assistant/child care attendant as generally

14  performed.   (Dkt. No. 18 at 6-11.)   Specifically, plaintiff contends that the vocational

15  expert's testimony conflicts with the information provided in the DOT, and the ALJ did not

16  obtain a "reasonable explanation" for the conflict.   (Dkt. No. 18 at 7-9.)   Plaintiff points out

17  that the DOT occupation the vocational expert identified, DOT 359.677-018, requires frequent

18  stooping (from one-third to two-thirds of the time) and occasional kneeling (from very little up

19  to one-third of the time), whereas the ALJ's hypothetical question to the vocational expert was

20  limited to occasional stooping and prohibited kneeling.   *See* SSR 83-10.   (AR 21, 86-87.)

21       Plaintiff further contends that she did not have past relevant work as generally

22  performed as a teacher's assistant/child care attendant because her job as a teacher's

REPORT AND RECOMMENDATION
PAGE -6

01  assistant/janitor was a "composite" of two or more separate jobs.   (Dkt. No. 18 at 9-10.)   She

02  asserts that because her job as a teacher's assistant/janitor was a composite, it does not have a

03  DOT counterpart, and, therefore, cannot be considered work as generally performed in the

04  national economy.   *Id.*[1]

05       The Commissioner concedes that substantial evidence does not support the ALJ's step

06  four decision, but asserts this error was harmless given that the ALJ made an alternate finding

07  that plaintiff was not disabled at step five.   (Dkt. No. 22 at 13.)   The Court agrees that if the

08  ALJ's step five finding is not in error, the ALJ's step four error is harmless.   However, as

09  discussed below, the Court finds substantial evidence does not support the ALJ's step five

10  decision that plaintiff could perform other work in the national economy.

11                                     <u>Step Five</u>

12       At step five, the Commissioner bears the burden of showing that the claimant can

13  perform other work that exists in significant numbers in the national economy, given the

14  claimant's age, education, work experience, and RFC.   *Tackett v. Apfel*, 180 F.3d 1094,

15  1100-01 (9th Cir. 1999).   The Commissioner may meet this burden by referring to the

16  Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2, or by eliciting the

17  testimony of a vocational expert.   *Id.* at 1101.   In order for the vocational expert's testimony

---

18

19

20       [1] Plaintiff also contends that substantial evidence does not support the ALJ's reliance on the vocational expert's testimony for her step-four decision because the vocational expert cited DOT 359.677-018 for the occupation of "childcare attendant," but the ALJ cited DOT 259.677-018 as the listing for teacher's assistant/child care attendant.   (Dkt. No. 18 at 7; AR 24, 85.)   DOT 259.677-018 does not correspond with any occupation. The vocational expert cited the correct DOT number for the childcare attendant position, however, and the ALJ relied on the vocational expert's testimony in determining that plaintiff was not disabled.   In light of the foregoing, the ALJ's reference to DOT 259.677-018 appears to be a harmless typographical error.

REPORT AND RECOMMENDATION
PAGE -7

01 to constitute substantial evidence, the ALJ must pose a hypothetical "that reflects all the

02 claimant's limitations." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir.1995).  The ALJ's

03 depiction of the claimant's impairments must be "accurate, detailed, and supported by the

04 medical record."  *Tackett*, 180 F.3d at 1101.

05       Plaintiff argues that the ALJ erred at in finding that she could perform other work

06 because the other jobs identified – semiconductor die loader (sedentary work), call out

07 operator (sedentary work), and folder (light work) – all exceeded the limitations imposed by

08 the ALJ's RFC finding.   (Dkt. No. 18 at 11-15.)

09       <u>*Sedentary Occupations*</u>:   *Semiconductor Die Loader and Call Out Operator*

10       Plaintiff argues that the ALJ erred in finding that she could work as a semiconductor

11 die loader and call out operator given the ALJ's finding that she could reach and handle only

12 frequently.[2]  (Dkt. No. 18 at 11.)   The Commissioner concedes substantial evidence does not

13 support the ALJ's finding that plaintiff could work as a semiconductor die loader, but contends

14 the ALJ did not err in finding that plaintiff had the RFC to work as a call out operator.   (Dkt.

15 No. 22 at 14.)

16       The ALJ's RFC finding included a restriction to frequent reaching and handling (from

17 one-third to two-thirds of the time).   (AR 21.)   The vocational expert testified that the job of

18 call out operator requires only occasional reaching and handling (up to one-third of the time),

19 and thus would not be precluded.   DOT 237.367-014.   However, she further testified that the

20 job of call out operator "has changed since it was originally developed in the last DOT where

21 ――――――――――――――――――

22     2 "Reaching is "extending the hands and arms in any direction."   SSR 85-15.   "Handling" is "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands."   *Id*.

01  an individual would be doing more writing, this person would be doing more keyboarding. . . .

02  So if one would like to consider keyboarding as a reaching level, it would be at the constant

03  level."  (AR 88.)  Thus, by the vocational expert's own testimony, the call out operator job

04  has changed to require constant reaching.  Because plaintiff does not have the RFC to

05  constantly reach, she is unable to work as a call out operator.

06      The Commissioner argues that the vocational expert testified that only "some" of the

07  call out operator jobs have changed to require constant reaching.  (Dkt. No. 22 at 15.)

08  However, as plaintiff contends, the vocational expert did not testify about the number of call

09  out operator jobs remaining, if any, that do not involve more than frequent reaching by virtue

10  of the keyboarding demands.  Accordingly, substantial evidence does not support the ALJ's

11  finding that plaintiff could perform 950 jobs in Washington and 67,480 jobs nationally.

12          *Light Occupations:   Folder*

13      Plaintiff argues that substantial evidence does not support the ALJ's finding that she

14  could perform the "light" occupation of folder given the ALJ's finding that she could stand for

15  no more than one hour at a time.  (Dkt. No. 18 at 14-15; AR 21.)  Specifically, plaintiff

16  asserts that the vocational expert's testimony conflicted with the DOT, the vocational expert

17  did not provide a reasonable explanation for the contradiction, and the ALJ did not explain

18  how she resolved the conflict in the written decision.

19      The Agency and the DOT use the same definitions for exertional categories of work.

20  *See* 20 C.F.R. § 404.1567 ("we classify jobs as sedentary, light, medium, heavy, and very

21  heavy.  These terms have the same meaning as they have in the Dictionary of Occupational

22  Titles.").  Under the DOT's definitions, "[s]edentary work involves sitting most of the time,

REPORT AND RECOMMENDATION
PAGE -9

01    but may involve walking or standing for brief periods of time." U.S. Dep't of Labor, DOT

02    (4th ed. rev. 1991), App. C, *available at* 1991 WL 688702; *see also* 20 C.F.R. § 404.1567(a).

03    SSR 96-9p further provides, "In order to perform a full range of sedentary work, an individual

04    must be able to remain in a seated position for approximately 6 hours of an 8-hour workday,

05    with a morning break, a lunch period, and an afternoon break at approximately 2-hour

06    intervals." SSR 96-9p.

07        SSR 83-12 similarly provides that light work requires "prolonged standing or

08    walking." *See* SSR 83-12 ("Persons who can adjust to any need to vary sitting and standing

09    by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of

10    work."). The DOT states that

11        a job should be rated Light Work:  (1) when it requires walking or standing to a
        significant degree; or (2) when it requires sitting most of the time but entails
12        pushing and/or pulling of arm or leg controls; and/or (3) when the job requires
        working at a production rate pace entailing the constant pushing and/or pulling of
13        materials even though the weight of these materials is negligible.

14    U.S. Dep't of Labor, DOT (4th ed. rev. 1991), App. C, *available at* 1991 WL 688702; *see also*

15    20 C.F.R. § 404.1567(b) (defining "light work" as requiring "a good deal of walking or

16    standing," or "sitting most of the time with some pushing and pulling of arm or leg controls.").

17    SSR 83-12 further provides that, if a person "must alternate periods of sitting and standing[,] .

18    . . [she] is not functionally capable of doing either the prolonged sitting contemplated in the

19    definition of sedentary work . . . or the prolonged standing or walking contemplated for most

20    light work."  SSR 83-12.

21        Here, the ALJ posed a hypothetical to the vocational expert based on the ALJ's residual

22    functional capacity finding.  The vocational expert testified that a person with this residual

01 functional capacity finding could work as a folder, DOT 369.687-018.   (AR 88.)   The

02 vocational expert testified that the DOT classifies the folder job as light work, with 239,000

03 jobs in the national economy and 4,528 jobs in Washington State.   *Id*.   She also testified that

04 her testimony was consistent with the DOT.   (AR 89.)

05         Despite her testimony to the contrary, the vocational expert provided information that

06 conflicted with the DOT without explanation.   Plaintiff argues, and the Court agrees, since

07 "light" DOT work requires "prolonged" standing and/or walking, testimony that a claimant

08 can perform a "light" job that does not require prolonged standing and/or walking (i.e.,

09 standing and/or walking for no more than one hour) conflicts with the DOT.   Because the

10 vocational expert testified that her testimony was consistent with the DOT, the ALJ failed to

11 properly follow the procedures of SSR 00-4p.

12         The Commissioner disagrees that there is a conflict between the vocational expert's

13 testimony and the DOT, arguing that the DOT definitions of "sedentary" and "light" do not

14 require standing or walking for more than one hour at a time, as provided in the vocational

15 hypothetical.   The Commissioner contends that the mandates of SSR 00-4p are limited to

16 identifying and obtaining a reasonable explanation for any conflicts between the vocational

17 expert's testimony and the DOT, and do not require the ALJ to inquire whether the vocational

18 expert's testimony conflicts with the definitions of "sedentary" and "light" contained in SSR

19 69-9p and SSR 83-12.   (Dkt. No. 22 at 15.)

20         However, as indicated above, the agency and the DOT use the same definitions for

21 exertional categories of work.   *See* 20 C.F.R. § 404.1567 ("we classify jobs as sedentary,

22 light, medium, heavy, and very heavy.   These terms have the same meaning as they have in

01 the Dictionary of Occupational Titles.").   Furthermore, SSRs constitute Social Security

02 Administration interpretations of the statute it administers and of its own regulations and are

03 binding on ALJs.   *See* 20 C.F.R. § 402.35(b)(1); *see also Paulson v. Bowen*, 836 F.2d 1249,

04 1252 n.2 (9th Cir. 1988) ("Once published, a ruling is binding upon ALJ's and is to be relied

05 upon as precedent in determining cases where the facts are basically the same.").

06 Accordingly, the Court rejects the Commissioner's argument that there is no conflict between

07 the vocational expert's testimony and the DOT or that the ALJ is not required to follow SSR

08 69-9p and SSR 83-12.

09       As indicated above, under SSR 00-4p, an ALJ has an affirmative responsibility to

10 inquire as to whether a vocational expert's testimony is consistent with the DOT and, if there is

11 a conflict, determine whether the vocational expert's explanation for the conflict is reasonable.

12 *Massachi*, 486 F.3d at 1152-54.   SSR 00-4p also requires the ALJ to explain in the decision

13 how she resolved the conflict.   The ALJ failed to do so here.   This failure prevents the Court

14 from being able to determine whether substantial evidence supports the ALJ's step-five

15 findings.   *Massachi*, at 1153–54. The matter should thus be remanded so that the ALJ can

16 perform the appropriate inquiries under SSR 00–4p.

17 <u>Medical Opinion Evidence</u>

18       Plaintiff next argues that the ALJ erroneously rejected the opinions of her treating

19 orthopedic surgeon, Ralph Haller, M.D.   (Dkt. No. 18 at 16-20.)   As a matter of law, more

20 weight is given to a treating physician's opinion than to that of a non-treating physician

21 because a treating physician "is employed to cure and has a greater opportunity to know and

22 observe the patient as an individual."   *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

01  1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).   A treating physician's

02  opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate

03  issue of disability, and can be rejected, whether or not that opinion is contradicted.

04  *Magallanes*, 881 F.2d at 751.   If an ALJ rejects the opinion of a treating or examining

05  physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not

06  contradicted by other evidence, and specific and legitimate reasons if it is.   *Reddick v. Chater*,

07  157 F.3d 715, 725 (9th Cir. 1988).   "This can be done by setting out a detailed and thorough

08  summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and

09  making findings."   *Id*. (citing *Magallanes*, 881 F.2d at 751).   The ALJ must do more than

10  merely state her conclusions. "[She] must set forth [her] own interpretations and explain why

11  they, rather than the doctors', are correct."   *Id*. (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22

12  (9th Cir. 1988)).   Such conclusions must at all times be supported by substantial evidence.

13  *Reddick*, 157 F.3d at 725.

14       The opinions of examining physicians are to be given more weight than non-examining

15  physicians.   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).   Like treating physicians, the

16  uncontradicted opinions of examining physicians may not be rejected without clear and

17  convincing evidence.   *Id*.   An ALJ may reject the controverted opinions of an examining

18  physician only by providing specific and legitimate reasons that are supported by the record.

19  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

20       Opinions from non-examining medical sources are to be given less weight than treating

21  or examining doctors.   *Lester*, 81 F.3d at 831.   However, an ALJ must always evaluate the

22  opinions from such sources and may not simply ignore them.   In other words, an ALJ must

01  evaluate the opinion of a non-examining source and explain the weight given to it.   SSR

02  96–6p.   Although an ALJ generally gives more weight to an examining doctor's opinion than

03  to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless

04  constitute substantial evidence if it is consistent with other independent evidence in the record.

05  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Orn*, 495 F.3d at 632–33.

06          In the present case, the ALJ evaluated Dr. Haller's opinions and gave them "great

07  weight" in part and "less weight" in other part.   (AR 23.)   The ALJ noted that in May 2002,

08  Dr. Haller indicated that plaintiff could perform light work, and in January 2004, he concluded

09  that she has little to no permanent impairment regarding her elbows.   (AR 23, 391, 421.)   The

10  ALJ noted that Dr. Haller was in the best position to assess plaintiff's limitations, and found his

11  opinion consistent with his own findings and with the record in general.   (AR 23.)   However,

12  the ALJ gave "somewhat less weight to Dr. Haller's May 2005 opinion that the claimant could

13  not perform repetitive grasping or handling, could not stand for prolonged periods and could

14  not kneel, crawl, or squat."   (AR 23 (citing AR 514).)   The ALJ explained that "[t]his opinion

15  is not fully consistent with Dr. Haller's May 2005 objective findings that were almost entirely

16  unremarkable:   normal strength, grip, sensation, reflexes, gait, and gross/fine manipulation."

17  *Id*.   In addition, the ALJ found Dr. Haller's May 2005 opinion was not consistent with the

18  overall findings in his progress notes.   (AR 23.)

19          The ALJ noted that Dr. Haller performed surgery on plaintiff's left elbow in March

20  2003, and on her right elbow in February 2005.   However, the ALJ found Dr. Haller's overall

21  findings indicated minimal limitations, noting that before and after the surgeries, plaintiff

22  exhibited normal elbow range of motion with no swelling or crepitus.   (AR 22, 377-426.)

REPORT AND RECOMMENDATION
PAGE -14

01  The ALJ also noted that Dr. Haller performed arthroscopic surgery on plaintiff's left knee in

02  July 2002, and on her right knee in May 2003.   However, the ALJ found Dr. Haller's overall

03  findings indicated minimal limitations.   (AR 22.)   For example, the ALJ noted that "Dr.

04  Haller noted tenderness in both knees but usually found normal gait, normal range of motion,

05  no instability, and no effusions."   *Id*.

06       The ALJ properly found Dr. Haller's 2005 assessment was inconsistent with his own

07  objective findings and progress notes.   Such a discrepancy is a specific and legitimate reason

08  for not relying on the doctor's opinion regarding plaintiff's ability to perform repetitive

09  grasping and handling, and stand for prolonged periods.   "The ALJ need not accept the

10  opinion of any physician, including a treating physician, if that opinion is brief, conclusory,

11  and inadequately supported by clinical findings."   *Thomas*, 278 F.3d at 957; *see also Batson v.*

12  *Commissioner*, 359 F.3d 1190, 1195 (9th Cir. 2004) (a treating physician's opinions may be

13  discounted when it is "in the form of a checklist, did not have supportive objective evidence,

14  was contradicted by other statements and assessments of [the claimant's condition], and was

15  based on [the claimant's] subjective descriptions of pain[,]" as well as when that opinion is

16  "conclusory, brief, and unsupported by the record as a whole . . . or by objective medical

17  findings[.]").

18       In addition, the ALJ properly found Dr. Haller's 2005 opinion was inconsistent with

19  the opinions of medical expert Arthur Lorber, M.D., and examining orthopedists Thomas

20  Trumble, M.D., Dhanvant Madhani, M.D., and James Champoux, M.D.   (AR 23-24.)   The

21  ALJ noted that Dr. Lorber was the only orthopedist to review the entire record and his opinions

22  were consistent with the objective findings.   (AR 23.)   The ALJ also noted that Dr. Trumble

REPORT AND RECOMMENDATION
PAGE -15

01   "concluded that the claimant's knee and elbow impairments did not cause any specific

02   limitations."   (AR 23, 506.)   The ALJ further noted that "Dr. Madhani concluded that the

03   claimant's bilateral elbow impairment caused no significant functional limitations, an opinion

04   consistent with his unremarkable findings that included normal muscle strength and full,

05   pain-free range of motion in both elbows."   (AR 24, 444-48.)   In addition, the ALJ noted that

06   "Dr. Champoux concluded that the claimant's knee impairments caused few limitations,

07   noting that she should avoid repetitive kneeling and squatting but could lift 25 to 30 pounds."

08   (AR 24, 452-55.)

09          Plaintiff argues that there is no requirement that a physician's opinion be "fully

10   consistent" with his objective findings for that opinion to be "fully respected as that of a

11   treating physician or treating specialist."   (Dkt. No. 18 at 18-19.)   Plaintiff contends that the

12   ALJ did not follow the Ninth Circuit's treating physician rule or the correlative regulatory

13   treating physician rule, given the length of treatment and Dr. Haller's expertise as an

14   orthopedic surgeon.   *Id*. (citing 20 C.F.R. § 404.1527(c)(3)-(6)).   However, the treating

15   physician rule does not require an ALJ to accept a treating physician's opinion which is brief,

16   conclusory, and unsubstantiated by relevant medical evidence.   *See Tonapetyan v. Halter*, 242

17   F.3d 1144, 1149 (9th Cir. 2001); *Johnson*, 60 F.3d 1432; *see also* 20 C.F.R. § 404.1527(c)(4)

18   ("Generally, the more consistent an opinion is with the record as a whole, the more weight we

19   will give to that opinion.").   Where a treating physician's conclusions about a claimant's

20   functional limitations "are not supported by his own treatment notes," the ALJ may reject that

21   opinion.   *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003); *see also Johnson*, 60

22   F.3d at 1433 (same).   The ALJ provided specific and legitimate reasons supported by

01 substantial evidence in the record for giving great weight to Dr. Haller's 2002 and 2004

02 opinions while affording less weight to his May 2005 opinion.   Because the ALJ provided

03 specific and legitimate reasons supported by substantial evidence for rejecting Dr. Haller's

04 opinion, the ALJ did not err.

05     Plaintiff argues that the ALJ erred by "apparently [giving] more weight to

06 non-examining medical expert Dr. Lorber's testimony based on his expertise as an orthopedic

07 surgeon than to Dr. Haller's May 2005 opinions."   (Dkt. No. 18 at 19.)   Contrary to

08 plaintiff's assertion, the ALJ did not find Dr. Lorber had greater expertise than Dr. Haller.

09 Rather, the ALJ gave significant weight to Dr. Lorber's opinion because he was the only

10 orthopedist to have reviewed the entire record and his opinions were consistent with the

11 objective findings.   (AR 23.)

12     Plaintiff also argues that the ALJ erred by giving significant weight to Dr. Madhani's

13 opinion.   Plaintiff argues that although Dr. Madhani opined that plaintiff "should probably

14 have lifting restriction of 10 pounds," the ALJ found plaintiff could lift 10 pounds frequently

15 and 20 pounds occasionally.   (Dkt. No. 18 at 19.)   However, when read in full and in context,

16 Dr. Madhani's opinion was consistent with the ALJ's findings.   Dr. Madhani stated, "The

17 claimant is capable of reasonably continuous employment.   Based on the subjective nature of

18 the symptoms, she should probably have lifting restriction of 10 pounds.   A Physical

19 Capacities Evaluation is recommended and would probably be helpful."   (AR 448.)

20 However, as the ALJ noted, Dr. Madhani also found plaintiff's subjective complaints were out

21 of proportion to the objective findings, which were almost entirely normal.   (AR 23, 444-48.)

22 Accordingly, the ALJ did not err by giving significant weight to Dr. Madhani's opinion.

01          Finally, plaintiff argues that "[t]he ALJ apparently gave weight to medical expert Dr.

02   Lorber's testimony ([A]R at 23), but Dr. Lorber's testimony was expressly based on his belief

03   that [plaintiff] was not credible."[3]   (Dkt. No. 18 at 20.)   Plaintiff cites a decision from the

04   Seventh Circuit which criticized an ALJ's adverse credibility determination that was based, in

05   part, on the opinion of a non-examining medical expert who expressed skepticism about the

06   severity of claimant's symptoms.   *Shauger v. Astrue*, 675 F.3d 690, 698 (7th Cir. 2012).

07   There, the Court found, although the ALJ gave great to the medical expert's opinion, the

08   medical expert had no experience with patients afflicted with claimant's impairment, had no

09   knowledge of the severity of symptoms associated with the impairment, had not examined the

10   claimant, did not address the testing conducted, and offered no medical reason for doubting

11   claimant's statements.   *Id*.   The Court thus concluded substantial evidence did not support the

12   ALJ's credibility determination.   *Id*.

13          Here, however, Dr. Lorber based his opinion on his expertise and experience as an

14   orthopedic surgeon, on his review of the entire record, and on the objective medical findings.

15   (AR 23, 42-44, 47-54.)   Furthermore, unlike the medical expert in *Shauger*, Dr. Lorber

16   offered medical reasons for doubting plaintiff's statements.   *Id*.   The ALJ properly relied on

17   Dr. Lorber's medical opinions.

18                                                    Obesity

19          Plaintiff argues that the ALJ erroneously failed to evaluate her obesity.   (Dkt. No. 18 at

20   21-22.)   She asserts that she had obesity at all relevant times, but the ALJ did not mention that

21   _____

22          3 Dr. Lorber testified, "There are significant secondary factors going on here throughout the course of her
     treatment and so forth and I do not believe that her pain level can be justified by the pathology present . . . I doubt
     her credibility, but that is an area that will be reserved for the judge to determine."   (AR 47-48.)

REPORT AND RECOMMENDATION
PAGE -18

01 fact in her written decision or address the impact of her obesity on her knee condition or her

02 ability to stand and walk.   *Id*.   The Commissioner argues that the ALJ did not need to address

03 plaintiff's obesity because there was no evidence plaintiff's obesity caused any functional

04 limitations or exacerbated any of her other impairments.   (Dkt. 22 at 6.)   The Commissioner

05 asserts that the ALJ carefully considered "the entire record," including the opinions of Dr.

06 Champoux, who noted plaintiff was obese but concluded plaintiff's knee impairments caused

07 few limitations.   *Id*. at 6 (citing AR 451, 454.)

08         As argued by the Commissioner, there is no evidence in the record, and plaintiff has not

09 set forth any, which indicates that plaintiff's obesity limits her functioning.   While plaintiff's

10 treating and examining physicians were aware of her obesity, the medical record is silent as to

11 whether and how plaintiff's obesity may have exacerbated her condition.   The fact that

12 plaintiff is obese does not by itself establish functional limitations and restrictions.   As plaintiff

13 has not identified any functional limitations due to obesity which would have impacted the

14 ALJ's analysis, the Court finds no error.   *See Burch v. Barnhart*, 400 F.3d 676, 684 (9th Cir.

15 2005).

16         Plaintiff next asserts that "[t]he ALJ gave significant weight to medical expert Dr.

17 Lorber's testimony who disavowed any expertise in obesity."   (Dkt. No. 18 at 22, Dkt. No. 23

18 at 7.)   However, a review of the record shows Dr. Lorber had appropriate expertise and

19 properly considered plaintiff's obesity.

20         At the hearing, Dr. Lorber testified, "I'm aware of [plaintiff's] morbid obesity.   She is

21 5'6" and weighs 305 pounds.   I have considered the affect of her morbid obesity upon her knee

22 condition."   (AR 43.)   On subsequent examination of the medical expert by the attorney,

01  plaintiff's counsel asked Dr. Lorber,

02       Q     And according to the National Institute of Health, doctor, there are three
               levels of obesity, are there not.[4]

03       A     I'm not an obesity expert.   All I can tell you that as an orthopedic surgeon,
04             given her height and weight, I would call her morbidly obese.   I can't be
               anymore specific than that.   I'm an orthopedic surgeon, I'm not a bariatric
05             physician.

06       Q     Okay.   So I believe she falls in the category of extreme under the National
               Health Institute and that can affect a person's ability to stand and walk,
07             right?

08       A     I'm not going to testify whether it's extreme or not.   I testified that she has
               morbid obesity.   Now I'm not familiar with the grading system that you're
09             discussing and I cannot testify about it.

10
    (AR 52.)   The ALJ interrupted,
11
         ALJ   I don't understand what the initial question is.   If you're asking what
12             impact morbid obesity has on these impairments, that's a fair question.   I
               think he's already said he took it into account in the RFC, but if you want to
13             ask again, then do so because that's really the question here whether he
               considered her morbid obesity in her orthopedic impairments.
14             . . .
               Doctor, have a number of the patients that you have treated over the many
15             years that you have been [in] practice been obese?

16       A     Indeed they have.

17       ALJ   All right.   And they have been obese to the extent that Ms. Rodriguez is
               obese?

18
         A     That is correct.
19

20
21       4 SSR 02-1p states, "The Clinical Guidelines recognize three levels of obesity.   Level I includes BMIs
    of 30.0-34.9.   Level II includes BMIs of 35.0-39.9.   Level III, termed "extreme" obesity and representing the
    greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40.   These levels
22  describe the extent of obesity, but they do not correlate with any specific degree of functional loss."

ALJ    So you have firsthand knowledge of what obesity – what type of impact obesity has on these types of impairments?

A      I believe I do.

ALJ    All right. . . . I don't know what else would be relevant for these purposes.

(AR 53-55.)   Accordingly, the Court finds Dr. Lorber had proper expertise.   Moreover, as the Commissioner points out, the ALJ also gave significant weight to the opinions of examining orthopedic surgeons Dr. Trumble and Dr. Champoux, who also noted plaintiff's obesity and concluded that plaintiff's knee impairments caused few limitations.   (AR 23-24, 451, 454, 505-506.)   The ALJ did not err in relying on Dr. Lorber's opinion.

<u>Reopening</u>

Finally, plaintiff argues that the ALJ *de facto* reopened the initial denial of her prior application for benefits plaintiff made in April 2005.   (Dkt. No. 18 at 22-23.)   Pursuant to 20 C.F.R. § 404.988, the Commissioner may reopen and revise an otherwise final and binding decision "[w]ithin 12 months of the date of the notice of the initial determination, for any reason[,]" "[w]ithin four years of the date of the notice of the initial determination if [the Commissioner] find[s] good cause, as defined in § 404.989, to reopen the case[,] or" "[a]t any time" under certain specified conditions.   *See* 20 C.F.R. §§ 404.988(a)-(c).   The Commissioner contends that the ALJ did not state that she reopened the prior decision, nor did she find any required condition for reopening satisfied under 20 C.F.R. § 404.988.   (Dkt. No. 22 at 16.)   The Court, however, agrees with plaintiff.

"[W]here the Commissioner considers 'on the merits' the issue of the claimant's disability during the already adjudicated period," then 'a *de facto* reopening' will be deemed to

REPORT AND RECOMMENDATION
PAGE -21

01  have occurred, and "the Commissioner's decision as to the prior period [will be] subject to

02  judicial review." *Lester*, 81 F.3d at 827.   When adjudicating plaintiff's 2008 application, the

03  ALJ considered on the merits the issue of plaintiff's disability with an onset date of December

04  14, 2001, the same onset date alleged in the 2005 application.   (AR 172, 177.)   As the two

05  applications have the same alleged onset date and thus involve the assessment of disability over

06  the same period, the Court concludes the ALJ *de facto* reopened the prior application.

07                                              IV.   CONCLUSION

08          For the foregoing reasons, the Court recommends that the Commissioner's decision be

09  REVERSED and REMANDED for further administrative proceedings.   A proposed order

10  accompanies this Report and Recommendation.

11          DATED this 27th day of December, 2012.

12

13                                                          _____
                                                            Mary Alice Theiler
14                                                          United States Magistrate Judge

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -22